ESTELLE LOTTINVILLE, *p.p.a. vs.* EDWARD F. DWYER, *Admr.*

REGINA LOTTINVILLE *vs.* SAME.

ARMAND LOTTINVILLE *vs.* SAME.

JULY 24, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. These are three actions in assumpsit, each based on a claim for services, against the estate of Annie McFarland, late of the city of Woonsocket, deceased. The cases were tried together to a jury in the superior court, and resulted in the following verdicts for the respective plaintiffs: Estelle Lottinville, $1500; Regina Lottinville, $3000, and Armand Lottinville, $500. The defendant in each case moved for a new trial on the usual grounds, and on the additional grounds that the verdict was excessive and that there was no evidence in the record which furnished a reasonable basis to support the verdict.

The trial justice, after a hearing, denied the motion in the cases of Estelle Lottinville and Armand Lottinville. In the case of Regina Lottinville, he granted a new trial unless the plaintiff, within five days, remitted all of the verdict in excess of $2000. A remittitur was duly filed in this case. In each case the defendant has brought to this court a similar bill of exceptions. His exceptions in each of said bills are to the denial of his motions for a directed verdict and for a new trial without condition, and to the refusal of the trial justice to give certain requests for instructions.

The defendant is the duly appointed and qualified administrator of the last will and testament of Annie McFarland. The plaintiffs, Armand and Regina Lottinville, husband and wife, are the parents of Estelle Lottinville, a child twelve years old who lived with them when the contract involved in all these cases was allegedly made with Annie McFarland,

then about seventy-five years of age. The Lottinville family and Annie McFarland occupied adjoining tenements for some four years prior to the latter's death on June 5, 1941.

On July 23, 1941, these plaintiffs filed three separate claims against the estate of Annie McFarland for services rendered to her over a period of about four years preceding her death. The defendant administrator disallowed all three claims, whereupon the plaintiffs brought these three separate actions in assumpsit. As stated by the plaintiffs in their brief, their respective claims are "based upon an express promise to pay" under an agreement with Annie McFarland by which "they respectively undertook to hire out their services to the deceased during the remainder of her life, and to wait for their pay until after her death." The amount of their respective compensation for such services was left undetermined.

The material circumstances leading up to the making of the agreement upon which the plaintiffs rely, as testified to by them, are substantially as follows: Before Annie McFarland moved into the tenement adjoining that of the plaintiffs, she lived in a nearby house. When she wanted certain things done, she would call on her neighbors, among whom were Estelle and her father, and always paid trifling sums for such services. As Annie McFarland became more friendly with Estelle, she was attracted by the child's aptitude for drawing and encouraged her in developing that talent. This was the situation about the fall of 1936, at which time Annie McFarland proposed to Estelle an extended plan of hire on deferred payments for the services of herself, her father and her mother, so that in later years Estelle would have enough money to attend an art school. Estelle replied that, while the plan was agreeable to her, she would have to consult her parents. In the evening of the same day when Annie McFarland made such proposal to Estelle, the latter's father and mother went to the former's home, when, according to them, they made the agreement upon which they now rely. Estelle was not present on this occasion.

We note at this point that although Estelle's parents, who are of French extraction, had at times some difficulty in expressing themselves in English, their testimony is understandable. Omitting immaterial details, Regina Lottinville's testimony in direct examination with reference to the agreement is as follows: "Q. What did she say to you as regards working for her, and how long? A. She asked like that, exactly this way: she said, 'Mrs. Lottinville, you see the way I am. I am not getting any better. I can hardly walk, and my rheumatism——.' I don't know how to say that. She says like that, 'I don't have no idea to move from here just so I could move into your home.' She says like that, 'I could pay you all together until I die. Of course, if you trust me,' she say, you know. She laugh. . . . Q. When did she say you would be paid if you agreed to work for her the remaining years of her life? A. 'Until I die', she says. 'I ain't going to live long because the way I am'. . . . Q. Now, did you, when she put up that proposition to you and asked you if you would trust her, did you agree, you and your husband, to carry on that way with Estelle? A. Yes, we agreed."

Armand Lottinville testified as follows on this point: "Q. And what was the substance of the conversation that passed between Annie and yourselves? A. Well, she said to my wife and me if it was all right for us, you know, to work for her and take care of her until she die. She said, 'I am not very old, I am not old—I am old', she said, 'and I don't think I am going to live very long now, so if you want to do, it will be all right', see. So if she trust me—if we trust her. I said O. K. Q. Did she say in the course of that conversation when you could expect to be paid? A. Yes. She said, 'I'll pay you when I die.' Q. And did you accept that arrangement? A. Yes. Q. And what were you, your wife and Estelle supposed to do for her? A. Well, my little girl— Q. I mean in a general way. Was it to take care of her? A. Yes. Take care of her, do her work and—.Q. Did you suggest any amount? A. No. Q. Did she suggest any amount? A. No. Q. Why didn't you? A. Well, because we trust her. Q. Had

you then any idea how long your services would have to run? A. No."

Following their testimony with reference to the agreement, the plaintiffs and their witnesses testified at great length as to the kind and extent of the services that they and each of them performed for Annie McFarland. The defendant, who was clearly at a disadvantage in disproving the plaintiff's claims, brought in a large number of witnesses, neighbors and friends of the deceased, many of whom testified that Annie McFarland never mentioned any agreement with the Lottinvilles to them; others, that she told them that she paid the plaintiffs well; others, that they performed services similar to those claimed to have been rendered by the plaintiffs during the period in question and were always paid for the same; others, that they saw the deceased doing her own housework and washing; others, that the deceased told them she was often alone and had very little to eat; and others, that they never saw any human filth on the floor in Annie's house resulting from her physical condition, which filth, according to the plaintiffs, was commonly thereon. This testimony, and much more of a similar character, was presented by the defendant as tending to show that the claims of these plaintiffs were improbable and unbelievable.

The defendant's first exception is to the denial of his motion for a directed verdict. The contention of the plaintiffs is that it was the intention of themselves and of Annie McFarland to make three separate contracts, and that the agreement, as testified to by them, although entire in form was severable in fact. The defendant, on the other hand, contends that the testimony shows an entire contract which could not be split into three separate causes of action, as the plaintiffs did in these cases. Relying mainly upon this contention, the defendant argues that his motion for a directed verdict should have been granted.

Whether a contract is entire or severable is not always an easy matter to determine. Each case must depend very largely on the terms of the contract. An added difficulty is

presented when one has to deal with an oral contract, and
this difficulty is further increased when one cannot be certain
that the language used in relating the contract is accurate
and definite in expression. All these difficulties appear in
the cases now before us. Under our well-established rule,
which by this time requires no citation of authorities, a ver-
dict should not be directed for a defendant unless the plain-
tiff cannot recover upon any reasonable view of the evidence.
In the instant cases we cannot say that the testimony with
reference to the oral agreement itself and the circumstances
surrounding the making thereof is so clear and unequivocal
as to render its construction a matter of law for the court.
The character and terms of such agreement, especially when
related by persons not fully acquainted with the English
language, are to a certain extent obscure and susceptible of
different meanings. The real intention of the parties re-
specting the agreement was therefore a question of fact for
the jury to decide.

The defendant also urges that his motion for a directed
verdict should have been granted because there was no evi-
dence of the value of the services rendered by the respective
plaintiffs. Our examination of the transcript shows that there
is some testimony from both Regina and Armand Lottin-
ville as to the reasonable worth of their services, and that
there is other testimony respecting payments made by Annie
McFarland at different times, before and during the time
involved in these cases, for services similar to those claimed
to have been rendered to her by all three of the plaintiffs.
The weight of such testimony was not for the court to con-
sider on a motion for a directed verdict.

The defendant further argues that the trial justice should
at least have directed a verdict in his favor in the case of
Estelle Lottinville, his contention being that, since she was
clearly an infant, there was no evidence of emancipation as
to permit her to bring suit in her own right by next friend.
Although the general principle is clear that a father is ordi-
narily entitled to the earnings of an infant child, it is also

well established that he may waive or relinquish such right in a particular instance. Where the proof shows that a contract for services is made by an infant child with the father's consent, or by the father for the benefit of such child, then that child ordinarily is entitled to his earnings in his own right and may sue for them in his own name by next friend.

The case of *Hobin* v. *Hobin*, 33 R. I. 249, cited by the defendant as having some bearing on the instant cases, is clearly distinguishable in its facts and therefore inapplicable here. The question of whether a father might waive or relinquish his right to the earnings of his infant child for services rendered by that child under a special agreement made by the father for the benefit of such child was not before this court in the *Hobin* case.

In *Whiting* v. *Earle*, 3 Pick. (Mass.) 202, a case which has been cited with approval in other jurisdictions, the court says: "We go so far as to say that where a minor son makes a contract for his services on his own account, and the father knows of it and makes no objection, there is an implied assent that the son shall have his earnings." *Atkins* v. *Sherbino*, 58 Vt. 248; *Atwood* v. *Holcomb*, 39 Conn. 270. In *Boynton* v. *Clay*, 58 Me. 236, it was held that such assent may be inferred by the parent appearing in court as next friend for the infant to aid him in the prosecution of his claim. A waiver or relinquishment of the parent's right to the earnings of the infant for a special purpose or in a particular instance, sometimes called partial emancipation, may occur although the infant continues to live with his parents. *Wisner* v. *Osborne*, 64 N. J. Eq. 614. 20 R. C. L. § 20 at p. 610.

Applying these principles to the case of Estelle Lottinville, the evidence is fairly open to the view that her father assented to her working for Annie McFarland with the understanding that she was to keep whatever compensation she would ultimately receive for such work to further her education. Whether this was so or not was a question of fact for the jury. For the reasons hereinbefore stated, the de-

fendant's exception in each of these cases to the denial of his motion for a directed verdict is overruled.

The defendant has a number of exceptions to the refusal of the trial justice to give certain requests to charge. These cases were tried on the theory of express agreements with Annie McFarland that the services rendered by the plaintiffs were to be paid for upon her death. The plaintiffs do not claim, nor does the evidence show, that such services were rendered by them with the hope of reward by testamentary disposition. With this in mind, we have examined defendant's requests to charge and find that some requests are too broad; others combine inconsistent elements; others are inapplicable to the evidence; and still others are substantially covered by the trial justice in his charge to the jury. All these exceptions are overruled.

The defendant's twelfth exception in each case is to the denial of his motion for an unconditional new trial, which motion includes the ground that the damages are excessive. The testimony in these cases is voluminous and conflicting. It would serve no useful purpose, even if the space and time at our command permitted, to relate with any degree of particularity the testimony of the plaintiffs respecting the nature and extent of the services which they claim to have performed for Annie McFarland. In brief, their testimony is to the effect that, after Annie McFarland moved into the same house with them, they ministered continuously and assiduously to her needs, taking care of her person, her house, her food, and satisfying in every way her desires for companionship and entertainment. These matters were exhaustively covered by the plaintiffs in the utmost detail. How the defendant tried to meet such testimony we have indicated heretofore in this opinion.

The exception we are now considering calls for a determination of whether the trial justice, in denying defendant's motion for a new trial, conditionally in one case and unconditionally in the other two, fully performed his duty by exercising his independent judgment upon the weight of the

evidence and the credibility of the witnesses on the different issues raised by the defendant's motion. *Colgan* v. *United Electric Rys. Co.*, 62 R. I. 184, 186. In a decision from the bench, he confined himself mainly to the question of damages, making some incidental observations, to which we will presently refer, as to the character and extent of the services claimed to have been performed by the plaintiffs. His decision, when read as a whole, shows that it was reached through reluctance to differ with the jury, irrespective of obvious circumstances. In our judgment, such a decision lacks the persuasive force that the approval of a jury's verdict by the trial justice is declared to have under the rule consistently applied by this court since the case of *Wilcox* v. *Rhode Island Co.*, 29 R. I. 292. In the circumstances, we have examined the testimony in order to determine for ourselves the weight of the evidence and the credibility of the witnesses.

The evidence on the question of liability is such that different minds may reasonably and fairly come to different conclusions therefrom. If the jury believed the plaintiffs, and apparently they did, as shown by their verdicts, they were warranted in finding that the defendant was liable. In this situation, we cannot go to the extent of holding, as the defendant argues, that the evidence for the plaintiffs on this point is so improbable and unbelievable that it is not entitled to any credence.

The question of damages, however, presents a markedly different situation. In his consideration of this question, the trial justice, in speaking with particular reference to the case of Armand Lottinville, says: "No question at all, in all three cases, that certain services were rendered. The extent of those services, of course, was a question for the Jury to pass upon. Frankly, the Court feels that the description of the services rendered by the plaintiffs were probably exaggerated, but *if* the services were rendered over the course of four or four and a half years—and that question was submitted to the Jury with careful instructions—they were rendered

and not paid for, then the Court feels that the sum of $500 is not an excessive sum . . . ." (italics ours)

In considering the amount of the verdict in the case of Estelle Lottinville, the trial justice first comments upon the fact that there was no evidence of any standard by which to determine the value of her services and then goes on to say: "But *if* the girl rendered the services described by her over a period of four and a half years, and that is a question of fact and the Court is not inclined to interfere with the province of the Jury in determining matters of fact, the Court feels that $1500 is not an excessive amount for the services rendered . . . ." (italics ours)

The trial justice has the following to say in reducing the amount of the verdict in the case of Regina Lottinville. After stating that the extent of her services was "very sharply in dispute", he continues: "The court, however, finds it difficult to find where Regina Lottinville could render services that were worth $3000. It is true she says she put in twelve hours a day and nine hours a day, but at the same time it was equally obvious that she was doing her own work, and that Annie McFarland, if she ever expected to pay, certainly did not expect to pay a very large amount for whatever services were rendered to her . . . . Certainly the twelve hours a day could not have extended over the entire period. First it could have been only an hour or two. It may have increased gradually and towards the end might have run up to twelve hours a day, although the testimony, the entire testimony, makes the Court somewhat skeptical about the extent of services rendered by Regina Lottinville. In other words, the Court is inclined to feel that probably it would be a good deal more like three or four hours a day than it would be like twelve."

Where a claim for services rendered is filed against the estate of a deceased person, especially when it is based solely upon an alleged oral contract on the part of the claimant, the personal representative of the deceased is at a decided disadvantage in contesting such a claim. Cases of this char-

acter call for the closest scrutiny. The proof to support a verdict against an estate on such claims, both as to liability and damages, must be clear and convincing. *Armour* v. *Doonan,* 55 R. I. 243; *Paradise* v. *Rick,* 63 R. I. 207. On a motion for a new trial in such a case, the trial justice does not perform his duty, as settled by long established practice, if he fails to test the soundness of the jury's verdict by the exercise of his independent judgment respecting the weight of the evidence and the credibility of the witnesses as to all the grounds upon which the verdict is challenged.

In the instant cases, the trial justice was very conservative in characterizing as "probably exaggerated" the plaintiffs' description of the services allegedly rendered by them to Annie McFarland, and in saying that he was "somewhat skeptical" about the extent of the services rendered to the deceased by Regina Lottinville. Our examination of the evidence not only shows a marked degree of exaggeration by the plaintiffs respecting the nature and extent of their services, but also reveals conduct on their part, both before and after Annie McFarland's death, that is indicative of overreaching. Taking into consideration the small sums that, according to the evidence, Annie McFarland paid to the plaintiffs and others in her lifetime for services similar to many of those claimed to have been performed by the plaintiffs under their alleged contracts, thus establishing a standard of pay between the parties, we agree with the trial justice when he says in his decision that "Annie McFarland, if she ever expected to pay, certainly did not expect to pay a very large amount for whatever services were rendered to her."

Upon consideration of the evidence in these cases, we are of the opinion that all three verdicts as returned by the jury are grossly excessive, and that the verdict in the case of Regina Lottinville, even though reduced by the trial justice, is still grossly excessive. The plaintiff in each of the instant cases should be given an opportunity to remit so much of the verdict as we find to be excessive. In our judgment the re-

spective plaintiffs would be fairly compensated upon receiving the following amounts: Regina Lottinville, $1000; Estelle Lottinville, $500; and Armand Lottinville, $200.

In each case the defendant's twelfth exception is sustained on the ground of excessive damages, and each case is remitted to the superior court for a new trial, unless the plaintiff therein shall file in the office of the clerk, of the superior court, on or before August 12, 1942, his or her remittitur of such verdict in excess of the amounts above specified. If such remittitur shall be filed as aforesaid, the superior court is directed to enter judgment for the respective plaintiffs in the amounts fixed by us.

*Eugene L. Jalbert, Valmore M. Carignan,* for plaintiffs.
*Edward F. Dwyer,* for defendant.